5/10/2001

**THIS DISPOSITION
IS NOT CITABLE AS PRECEDENT
OF THE T.T.A.B.**

Paper No. 10

BAC

**UNITED STATES PATENT AND TRADEMARK OFFICE**
_____

**Trademark Trial and Appeal Board**
_____

In re Kent-Gamebore Corporation
_____

Serial No. 75/536,749
_____

Susan M. Kornfield of Bodman, Longley & Dahling LLP for Kent-Gamebore Corporation.

Richard A. Straser, Trademark Examining Attorney, Law Office 114 (K. Margaret Le, Managing Attorney).
_____

Before Cissel, Seeherman and Chapman, Administrative Trademark Judges.

Opinion by Chapman, Administrative Trademark Judge:

Kent-Gamebore Corporation (a Delaware corporation) has filed (on August 14, 1998) an application to register on the Principal Register the mark IMPACT for "ammunition." Applicant claimed dates of first use and first use in commerce of September 5, 1985.

Registration has been finally refused under Section 2(d) of the Trademark Act, 15 U.S.C. §1052(d), in view of the previously registered mark HI-IMPACT for "ammunition."[1]

---

[1] Registration No. 1,755,205, issued on the Principal Register on March 2, 1993, Section 8 affidavit accepted, Section 15 affidavit acknowledged.  The claimed date of first use is June 26, 1991.

Applicant has appealed, and briefs have been filed. Applicant did not request an oral hearing.

We affirm the refusal to register. In reaching this conclusion, we have considered all of the relevant du Pont[2] factors.

Both applicant's and registrant's goods are identified in the respective application and registration as "ammunition." Thus, under the du Pont factor of "the similarity or dissimilarity and nature of the goods or services as described in an application or registration...," the goods involved herein are identical. See Octocom Systems Inc. v. Houston Computer Services Inc., 918 F.2d 937, 16 USPQ2d 1783 (Fed. Cir. 1990).

Obviously, identical goods would travel through all the same channels of trade to all the usual purchasers. See In re Smith and Mehaffey, 31 USPQ2d 1531 (TTAB 1994).

"When marks would appear on virtually identical goods or services, the degree of similarity necessary to support a conclusion of likely confusion declines." Century 21 Real Estate Corp. v. Century Life of America, 970 F.2d 874, 23 USPQ2d 1698, 1700 (Fed. Cir. 1992).

---

[2] In re E. I. du Pont de Nemours & Co., 476 F.2d 1357, 177 USPQ 563 (CCPA 1973).

Turning to a consideration of the involved marks, we agree with the Examining Attorney that the marks IMPACT and HI-IMPACT are similar in sound, appearance and connotation, resulting in similar commercial impressions. Specifically, the marks look and sound alike due to the shared word IMPACT, with the additional prefix "HI" being physically connected by a hyphen to the dominant term IMPACT; and both marks project a similar connotation, with the connotation of HI-IMPACT suggesting greater penetration ammunition than IMPACT ammunition. Even if purchasers note the differences in the marks, they are likely to believe that applicant's mark is a version of registrant's mark, adopted for ammunition of lesser effect. Thus, under the du Pont factor of "similarity or dissimilarity of the marks in their entireties...," the involved marks are similar.

Applicant does not contend that the marks or the goods, as identified, are dissimilar. Applicant asserts, however, that with an appropriate analysis of all the relevant du Pont factors in this case, there is no reasonable likelihood of confusion.[3] Applicant specifically asserts the following (brief, p. 5):

> There are many factors to be considered
> in determining whether or not marks are

---

[3] Priority of use is not an issue in this ex-parte Section 2(d) case.

> confusingly similar, not just whether
> the marks have a word in common.  Some
> of the factors to be considered in
> determining whether or not marks are
> confusingly similar include, but are
> not limited to, the following:
>
> (1) the conditions under which,
> and buyers to whom, sales are made,
> i.e., 'impulse' vs. careful,
> sophisticated purchasing; (2) the
> nature and extent of any actual
> confusion; (3) the length of time
> during, and conditions under which,
> there has been concurrent use without
> evidence of actual confusion; (4) the
> extent to which applicant has a right
> to exclude others from use of its mark
> on its goods; (5) any other established
> fact probative of the effect of use.
> (Citations omitted).

Even if we assume, as argued by applicant, that the purchasers of ammunition[4] are sophisticated and/or at least exercise great care in their buying decisions, they are still likely to be confused as to the source of legally identical goods when both are identified by very similar marks.  That is, even careful purchasers are not immune from confusion.  See Weiss Associates Inc. v. HRL Associates Inc., 902 F.2d 1546, 14 USPQ2d 1840 (Fed. Cir. 1990); and Aries Systems Corp. v. World Book Inc., 23 USPQ2d 1742, footnote 17 (TTAB 1992).  Given the close similarities of the marks, although careful purchasers may

---

[4] Applicant acknowledges that ammunition is purchased not only by professionals, but also by members of the general public.

notice that one mark contains the prefix "HI-" and the other does not, they are likely, as we stated previously, to view IMPACT and HI-IMPACT as variant marks identifying a single source, rather than to believe they are different marks identifying ammunition from separate sources.

Applicant contends that it and its predecessor in interest, 3-D Investment, Inc. (hereafter 3-D), and registrant have concurrently used and have owned registrations for their respective marks IMPACT and HI-IMPACT, both for ammunition, for several years. According to applicant, in about ten years of concurrent use, neither applicant nor its predecessor in interest was ever made aware of a single instance of actual confusion.

Applicant's attorney stated during prosecution of the application[5] that applicant's predecessor first adopted the mark IMPACT for ammunition on September 5, 1985; that the IMPACT line of ammunition was presented nationally at trade shows in 1985 and appeared in 3-D's 1985 catalog; that sales doubled from $135,000 in 1985 to $385,000 in 1986; that 3-D obtained a federal registration of the mark IMPACT on June 30, 1992; that "thereafter, the Mark was used

---

[5] We note for the record that applicant submitted no affidavit or declaration from an officer of applicant corporation regarding any of these matters, e.g., assignment of rights, nature and extent of use.

continuously by 3-D in association with ammunition throughout the U.S."; that since March 1998, when applicant obtained the rights in the mark by assignment, "Applicant continuously has used the Mark in association with ammunition throughout the U.S. and Canada"; and that applicant "advertises the Mark in twenty (20) different magazines throughout the U.S. and Canada, and Applicant's gross sales of ammunition identified by the Mark exceeded 1.6 million dollars between October, 1999 and October, 2000" (brief, p. 2).

The problem with the foregoing is that applicant has not provided specific information about its use of its IMPACT mark on ammunition in the United States per se; for example, there is no breakdown of applicant's advertisements or sales in the United States separate from those in Canada. Thus, without information on the nature and extent of applicant's use of the mark in the United States, we cannot conclude that there has been opportunity for actual confusion. See In re Great Lakes Canning Inc., 227 USPQ 483 (TTAB 1985).

Notably, the record does not include information about the cost of the involved goods. Presumably, these goods (the specimen of record is a box which holds ten shells) are not extremely expensive, and in that circumstance, it

is less likely that purchasers will complain about a product. As a result, neither applicant nor registrant are likely to receive telephone calls or letters from customers or potential customers regarding instances of actual confusion.

Moreover, in its reply brief (p. 4) applicant explained as follows:

> The word 'ammunition' is used to describe a wide range of products. Ammunition may mean handgun bullets (used by police officers), shot gun [sic] shells (used by bird hunters), or rifle slugs (used by big game hunters), to name a few. In fact, [applicant's] mark IMPACT is used in connection with shotgun shells, while [registrant's] mark HI-IMPACT is used in connection with rifle slugs.

These differences in the specific type of ammunition sold by applicant and registrant may also account for the lack of instances of actual confusion. In addition, there is no information from the registrant about any actual confusion.

Based on this record we cannot ascribe significant weight in applicant's favor to the du Pont factors regarding actual confusion.

Applicant has also pointed to a registration, No. 1,697,535, which issued June 30, 1992, to applicant's predecessor, 3-D, for the mark IMPACT for "ammunition." This registration was cancelled in 1999 under Section 8 of

7

the Trademark Act.  Thus, this registration coexisted with the cited registration, which issued in 1993, for a period of almost 6 years.

While it is true that applicant's predecessor at one time owned a registration, that registration has been cancelled.  There is no pattern of multiple registrations owned by applicant and registrant issuing from the USPTO over the course of many years from which we might infer that registrant and applicant have a tacit agreement to coexist.  Rather, in this situation, both applicant's predecessor and registrant applied to register their marks within a few months of each other in 1991, and registrations ultimately issued to both parties.  A Section 8 affidavit of use was not filed for applicant's predecessor's registration and, therefore, it was cancelled.  We are left to speculate why registrant has not taken action against applicant (or its predecessor).  For example, perhaps no action was taken due to the differences in the actual specific types of ammunition sold under the respective marks IMPACT (shotgun shells) and HI-IMPACT (rifle slugs), or because applicant has a greater presence in Canada than the United States, as explained previously herein.

Applicant's argument that the behavior of both applicant and registrant in not seeking to oppose the other's application, or cancel the other's registration, or sue the other in court "establishes that neither believes there is a likelihood of confusion" (brief, p. 11) is not persuasive for the reasons explained above. If the parties believe there is no likelihood of confusion, applicant could have sought registrant's written consent to registration of this mark. In fact, the Examining Attorney invited applicant to submit "a valid and detailed consent to register from the owner of the cited mark," and he stated that he would then entertain a request for reconsideration (Final Office action, p. 2).[6] Applicant chose not to do so. If applicant had submitted such a consent, the Examining Attorney and, if necessary, the Board, would give great weight to such a written consent from the cited registrant. See Bongrain International (American) Corporation v. Delice de France Inc., 811 F.2d 1479, 1 USPQ2d 1775 (Fed. Cir. 1987); and In re E. I. du Pont de Nemours & Co., supra.

---

[6] Applicant's assertion in its brief (p. 6) that the Examining Attorney's statement is an implicit concession that there is no likelihood of confusion is disingenuous. The Examining Attorney merely suggested that he would entertain a request for reconsideration of the final refusal if applicant submitted registrant's written consent.

Applicant also argues that in registering the cited mark one year after 3-D's registration issued, the USPTO was obligated under the law to treat the cited mark as the newcomer and resolve any doubt regarding likelihood of confusion in 3-D's favor. Applicant's recitation of the law when there is doubt on the issue of likelihood of confusion is correct, but inapposite. The issue before us now is whether applicant's mark IMPACT for ammunition is likely to cause confusion with the cited mark HI-IMPACT for ammunition, not whether the Examining Attorney who examined the application which issued as the cited registration acted appropriately, or whether he did or did not have any doubt on the issue of likelihood of confusion.

Neither the Board, nor the Courts, are bound by prior decisions of Trademark Examining Attorneys, and each case must be decided on its own merits, on the basis of the record therein. See In re Wilson, 57 USPQ2d 1863 (TTAB 2001). See also, In re Nett Designs Inc., __ F.3d __, 57 USPQ2d 1564 (Fed. Cir. 2001). Based on the record now before us in this case, we have no doubt that applicant's use of IMPACT for ammunition is likely to cause confusion with HI-IMPACT for identical goods.

We can only speculate as to why the cited registration issued over applicant's predecessor's now-cancelled

10

registration. In any event, even when one registration issues over the other and both exist side-by-side for some period of time (in this case about six years), that is one element "which is placed in the hopper with other matters which ordinarily are considered in resolving the question of likelihood of confusion, but which is not in the least determinative of said issue." In re Trelleborgs Gummifabriks Aktiebolag, 189 USPQ 106, at 107 (TTAB 1975). In this case, we find that the factors of the identical goods and highly similar marks far outweigh this point in our consideration of likelihood of confusion as a whole.

Finally, applicant argues that its mark should be passed to publication and the cited registrant will have an opportunity to oppose if it chooses. This same argument was made by the applicant in the case of In re Dixie Restaurants Inc., 105 F.3d 1405, 41 USPQ2d 1531 (Fed. Cir. 1997); and the Court responded as follows (at 1535):

> Dixie argues alternatively that the PTO should pass the mark to publication and allow the registrant to oppose the applicant's mark, if it chooses. But it is the duty of the PTO and this court to determine whether there is a likelihood of confusion between two marks. (Citation omitted.) It is also our duty 'to afford rights to registrants without constantly subjecting them to the financial and other burdens of opposition proceedings.' (Citations omitted.)

11

> Otherwise protecting their rights under the Lanham Act would be an onerous burden for registrants.

We have found that confusion is likely to occur in this case. Accordingly, it is not appropriate to allow applicant's mark to be published.

**Decision:** The refusal to register under Section 2(d) is affirmed.